**Fred C. HENDERSON, Plaintiff,**

v.

**UNITED PARCEL SERVICE, INC., Defendant.**

**No. IP 88–197–C.**

United States District Court,
S.D. Indiana,
Indianapolis Division.

Feb. 23, 1990.

J. Frank Hanley, II and Christian D. Abel, Indianapolis, Ind., for plaintiff.

Daniel C. Emerson and Keith E. White, Bose McKinney & Evans, Indianapolis, Ind., for defendant.

ENTRY ON INVOLUNTARY
DISMISSAL PURSUANT TO
FED.R.CIV.P. 41(b)

TINDER, District Judge.

*Findings of Fact*

1. The defendant, United Parcel Service, Inc., (U.P.S.) is engaged in the small package delivery business throughout the United States and in numerous countries overseas. U.P.S. promises timely delivery service to its customers and requires its employees to commit their personal efforts toward effectuating this policy.

2. Within the United States, U.P.S. is divided into twelve regions and geographically subdivided into districts. In turn, each district maintains several departments, each of which is responsible for a particular function of the business, including, but not limited to, labor, loss prevention, personnel, and automotive.

3. U.P.S. hired the plaintiff, Fred C. Henderson (the plaintiff or Henderson), on

November 12, 1984, as a journeyman mechanic, an hourly position. Henderson is a black, or African–American, male.

4. Henderson's supervisor, Indiana District Automotive Department Manager, Calvin R. Fessel, promoted Henderson to the salaried position of automotive department supervisor on April 1, 1985. At that time, Henderson received a copy of the U.P.S. Policy Book.

5. The U.P.S. Policy Book provides, among other things:

> One of our long-standing strengths is the willingness of our people to take on job assignments where needed. Such moves to strengthen our management organization may involve promotions, lateral assignments, transfers, or relocation. Each move should be considered in view of enhancing individual career opportunities.

> In each case, we try to evaluate in advance the effect of the move on the individual as well as the company. We weigh the considerations carefully before any action is taken; no transfer should be undertaken lightly.

6. Supervisory employees of U.P.S. are transferred and retransferred throughout the world.

7. Henderson held the position of automotive department supervisor at U.P.S.'s 81st street facility in Indianapolis, Indiana from on or about April 1, 1985, until the termination of his employment on May 15, 1987, except for a brief period of time in late 1986 and early 1987 when he was on special assignment at U.P.S.'s Central Parts facility near Chicago, Illinois.

8. Based on Fessel's recommendation, Henderson received both the "additional half month check" annual bonus and the "partnership management incentive" annual bonus in 1985 and 1986. Both bonuses were discretionary and would not have been awarded to Henderson but for Fessel's recommendation.

9. On January 6, 1987, Henderson met with Fessel to discuss a proposed transfer of Henderson to the Regional Parts (also referred to as Central Parts or the Franklin Park Facility) near Chicago, Illinois. During that meeting, Henderson did not advise U.P.S. that he was not interested in a transfer to the Chicago area. Henderson had previously expressed a general willingness to accept transfers to various U.P.S. operations, (Defendant's Exhibit 11) including the regional parts transfer.

10. U.P.S. selected Henderson for the proposed transfer to the Chicago area between January 6, 1987, and January 14, 1987.

11. On January 14, 1987, when he was told that he had been selected for the reassignment, Henderson advised Fessel for the first time that he was reluctant to accept the reassignment to the Chicago, Illinois area. On January 16, 1987, Henderson advised Fessel that he was unwilling to accept the transfer. Henderson told Fessel that Mrs. Henderson did not want to move, that the cost of housing in the Chicago area was too expensive and that he (Henderson) had changed his mind.

12. On January 26, 1987, Indiana District Personnel Manager, Garry L. Power, Fessel, and Henderson met concerning Henderson's refusal to accept the transfer to the Chicago area. Henderson was not disciplined, but was advised that any future refusals to accept transfers would not be tolerated.

13. The U.P.S. Policy Book provides that each management employee is required to submit an itemized accounting of money spent on the company's behalf, in order for the management employee to be reimbursed for such expenses by U.P.S. It further provides that U.P.S. expects honesty from its management employees in their handling of the substantial amounts of money, merchandise, and property with which they are entrusted. It also provides that U.P.S. insists on integrity in the preparation of all reports.

14. In February of 1987, Henderson prepared an expense report for his January 1987 reimbursable expenses. That report contained entries showing meal expenses of $25.00 for each day but three that he worked in Central Parts during the month of January, 1987. Henderson provided no

receipts in support of this report and his immediate supervisor advised him that daily meal expenses of $25.00 or more required documentation by receipts. Henderson discarded that expense report. (Plaintiff's Exhibit TT)

15. Henderson then prepared a modified expense sheet, to reflect a uniform claim of $24.50 for each of the days in January 1987 for which he had earlier claimed $25.00. (Plaintiff's Exhibit JJ).

16. Henderson was not disciplined for his January 1987 expense reporting, but the discarded report was retrieved and he was confronted with it. He was advised to review U.P.S.'s policy on integrity referenced in paragraph 13, *supra.*

17. A meeting of all automotive department supervisors was scheduled for 1:00 p.m. on May 8, 1987, to be held at the 81st street facility in Indianapolis, Indiana.

18. Several weeks prior to the meeting date, Henderson's immediate supervisor, Thomas Zdoniak, instructed Henderson to prepare and deliver a presentation on engines and tires at the May 8, 1987, meeting referenced in paragraph 17, *supra.* Zdoniak advised Henderson that he would be allowed to report to work several hours later than his usual 12:00 a.m. start time, so that he would be fresh for the 1:00 p.m. meeting on May 8, 1987. Henderson was also told that he would be permitted to leave the meeting early, after completion of the meeting.

19. Henderson's supervisors did not excuse him from attending the May 8, 1987, meeting nor did he ever tell anyone that he would not attend the May 8, 1987, meeting.

20. Henderson was at work on May 8, 1987, and at no time did he advise anyone from U.P.S. that he did not intend to attend the scheduled meeting. Without notice to his superiors or his fellow supervisors, he left the 81st street facility before the meeting commenced. He never appeared at the meeting to make his presentation. He did not attempt to attend the meeting after completing the second "road call" he handled that day.

21. On May 11, 1987, Zdoniak met with Henderson to discuss his failure to attend the May 8, 1987, meeting. Henderson explained that rather than adjusting his work schedule, he had reported to work that day at his ordinary starting time, midnight. Henderson stated that he was too tired at the time of the meeting and had gone home instead of attending the meeting. During this discussion, Henderson provided no other reasons for his absence from the May 8, 1987, meeting.

22. On May 15, 1987, Fessel met with Henderson to discuss his failure to attend the May 8, 1987, meeting. Henderson explained to Fessel on May 15, 1987, that he arrived for work at 12:30 a.m. or 1:00 a.m. on May 8, 1987. He further stated that he had Air Force Reserve duty and therefore he wanted to spend Friday afternoon with his family. During this discussion, Henderson provided no other reasons for his absence from the May 8, 1987, meeting. At that same meeting, Fessel requested and accepted Henderson's resignation from employment with U.P.S. Fessel stated that the reason for the adverse employment action arose from Henderson's failure to attend the May 8, 1987, meeting. Henderson was scheduled for Air Force Reserve duty the weekend of May 16 and 17, 1987, not the weekend of May 7 and 8, 1987. During Fessel's discussion with Henderson, there was no mention, by either party, of Henderson's earlier refusal to accept a transfer or his problems with his expense records.

23. At his deposition in this matter held on April 15, 1988, Henderson stated that he attended to a "road call" for U.P.S. during part of the May 8, 1987, meeting. At approximately 2:00 p.m. on May 8, 1987, while he was at U.P.S.'s Castleton facility, almost fourteen miles from the 81st Street facility, the Castleton facility received a car telephone call concerning a disabled U.P.S. vehicle (Car NO. 41894), driven by Kevin Miles, in Noblesville, Indiana. Henderson went to the location of the vehicle and remained there approximately an hour and twenty minutes. He then left the scene and went home at approximately 3:30 p.m.

24. Henderson is unaware of any similarly situated supervisor employed by U.P.S. who has ever been instructed specifically to make a presentation at a required departmental meeting and simply elected not to attend the meeting without advising anyone of the circumstances of his absence.

25. No evidence was presented to show that any other supervisor employed by U.P.S. was offered a lateral transfer and refused the transfer without suffering adverse employment action. The only evidence that a lateral transfer may not have been accepted involved a white male named Pete Martin. Fessel testified that Martin was considered for a job at the Franklin Park location. Fessel said that Martin tried to do the job, but was physically unable to perform it because of his health. No direct evidence was introduced to show that Martin was offered or refused a transfer. Fessel testified that Martin could not accept the transfer, although he (Martin) wanted it. From this, it could be inferred that a transfer was offered to Martin, and it could be inferred that he refused the transfer, albeit because of health considerations.

However, there is a complete absence of evidence with regard to what, if anything, happened to Martin after the Franklin Park transfer matter was resolved. When asked if Martin still works for U.P.S., Fessel replied that he did not know. No evidence was introduced to show that Martin's employment continued after the Franklin Park transfer matter, and if it did, that he suffered no adverse employment action thereafter.

The only other white supervisor mentioned in the testimony was a Bryan Paris. No evidence was introduced directly showing, or from which it could be inferred, that he was offered a lateral transfer and that he refused the same.

26. Henderson filed a Charge of Discrimination with the Equal Employment Opportunity Commission (herein "EEOC") on May 26, 1987, within 240 days of the alleged unlawful employment practices. The EEOC forwarded the charge to the Indiana Civil Rights Commission (herein "ICRC") for initial processing.

27. Henderson received a notification of Right to Sue on November 25, 1987, from the EEOC. Henderson filed this lawsuit within 90 days of his receipt of the notification of Right to Sue.

*Conclusions of Law*

1. This court has jurisdiction over the subject matter of this suit and over the parties.

2. The law is with U.P.S. and against the plaintiff, Fred C. Henderson.

3. The plaintiff has attempted to proceed in this lawsuit under a theory of disparate treatment unlawful under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*

4. The plaintiff has failed to make out a prima facie case of disparate treatment. No evidence was introduced that showed that similarly situated supervisors of other races were treated differently than the plaintiff after refusing a lateral transfer or after failing to attend a required departmental meeting.

5. Even if the reason given for the forced resignation by the defendant, namely, that he failed to attend the required meeting, was not the true reason for the adverse action, no prima facie showing of discrimination has been made. The plaintiff has failed to show that the adverse action taken toward him is related to racial discrimination. If the plaintiff was treated adversely or improperly in connection with the refused transfer, his expense reports and/or the missed meeting, no connection has been shown between such treatment and racial discrimination. Even if all inferences are construed in favor of the plaintiff, there has not been a showing of prima facie discrimination.*

* If any of the findings of fact would be more appropriately called conclusions of law, or if any of the conclusions of law could be considered findings of fact, or if there are mixed findings and conclusions, these determinations should be considered as what they are, regardless of their label.

### Discussion

■ At the close of the plaintiff's case in chief, the defendant moved for involuntary dismissal pursuant to Fed.R.Civ.P. 41(b), which allows dismissal if the court finds that the plaintiff has shown no right to relief upon the facts and the law. In ruling on this motion, this court does not make any special inferences in the plaintiff's favor; instead, this court must examine and weigh all of the evidence. *See Ekanem v. Health & Hosp. Corp.*, 724 F.2d 563, 568 (7th Cir.1983), *cert. denied*, 469 U.S. 821, 105 S.Ct. 93, 83 L.Ed.2d 40 (1984); *Woods v. North Am. Rockwell Corp.*, 480 F.2d 644 (10th Cir.1973). In a Title VII action, dismissal is proper under Fed.R.Civ.P. 41(b) if the plaintiff has failed to present a prima facie case of discrimination at the close of his or her case in chief. Dismissal is also proper at the close of the plaintiff's case if the defendant's reasons for its actions are on the record and if the evidence is sufficient to support a judgment for the defendant. *Ekanem*, 724 F.2d at 568.

Title VII of the Civil Rights Act of 1964 prohibits discrimination "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... race...." 42 U.S.C. § 2000e–2(a)(1). Title VII claims may be pursued under either a disparate treatment or a disparate impact analysis. The plaintiff's claim is one alleging disparate treatment. The factual inquiry in the disparate treatment cases is whether the defendant intentionally discriminated against its employee on account of race or another characteristic covered by the statute. *United States Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715, 103 S.Ct. 1478, 1481–82, 75 L.Ed.2d 403 (1983); *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981); *Benzies v. Illinois Dep't of Mental Health & Developmental Disabilities*, 810 F.2d 146, 148 (7th Cir.), *cert. denied*, 483 U.S. 1006, 107 S.Ct. 3231, 97 L.Ed.2d 737 (1987). Discriminatory intent must be a "but for" cause of the action taken by the defendant. *Germane v. Heckler*, 804 F.2d 366, 368 (7th Cir.1986); *McCluney v. Jos. Schlitz Brew-*

*ing Co.*, 728 F.2d 924, 928 (7th Cir.1984); *see also Benzies*, 810 F.2d at 148 ("Unless the employer acted for a reason prohibited by the statute, the plaintiff loses."). A plaintiff may establish intentional discrimination either by direct proof or via the three step method of indirect proof outlined in *Burdine* and *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Friedel v. City of Madison*, 832 F.2d 965, 972 (7th Cir.1987). Under the indirect method of proof, the plaintiff first has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. *Burdine*, 450 U.S. at 252–53, 101 S.Ct. at 1093–94. If the plaintiff succeeds in proving the prima facie case, a rebuttable presumption arises and the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for its employment action. *Id.; McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824. Should the defendant carry this burden, the presumption raised by the prima facie case is rebutted. *Burdine*, 450 U.S. at 255, 101 S.Ct. at 1094–95. The plaintiff must then prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were merely a pretext for discrimination. *Burdine*, 450 U.S. at 252–53, 101 S.Ct. at 1093–94; *see also Reeder–Baker v. Lincoln Nat'l Corp.*, 834 F.2d 1373, 1376–77 (7th Cir.1987); *Collins v. State of Illinois*, 830 F.2d 692, 698 (7th Cir.1987).

The record in this case fails to reveal a shred of direct evidence of discrimination on the basis of race leading to Henderson's forced resignation. Therefore, the plaintiff may prevail only by utilizing the *McDonnell Douglas–Burdine* method of indirect proof. Focusing on the first step of this method of proof, U.P.S. contends that the plaintiff has failed to establish a prima facie case of race discrimination. U.P.S. concedes that the plaintiff is a member of a protected class and that he suffered an adverse action leading to his forced resignation. However, U.P.S. contends that there has been no showing that the plain-

tiff was treated differently than persons of other races.

Indeed, the only evidence to support the plaintiff's allegation of discriminatory intent was that a white employee, Pete Martin, was considered for a lateral transfer in the early part of 1987 but could not accept the transfer for health-related reasons. There was no evidence from which this court could infer that Martin did or did not suffer any penalties for his inability to transfer; nor was there any evidence offered from which this court could infer that U.P.S.'s treatment of Martin, if he did receive better treatment than the plaintiff, was the result of his race. Though not required to do so at this stage of the case, even if the court construes all inferences in favor of the plaintiff, no evidence is in this record would allow me to conclude that a prima facie case of discrimination has been shown.

The plaintiff asserted that his denial of the transfer in January 1987 was the beginning of a deteriorating relationship with his superiors who started to closely scrutinize the plaintiff's performance. Shortly thereafter, the plaintiff's superiors questioned the plaintiff's integrity because of an inaccurate expense account form that the plaintiff had filled out, though he had not submitted it for reimbursement. The final event that lead to the plaintiff's forced resignation was the plaintiff's absence at a meeting at which he was to make a presentation. He asserts that he was attending to an work-related emergency situation that necessarily prevented him from attending the meeting. The plaintiff alleges that these events were a result of his refusal to accept a transfer to Illinois and that other non-black employees who had refused transfers had not been treated in the same manner.

Even assuming that the plaintiff was treated poorly because of his refusal to accept the transfer and that his forced resignation was not because of his failure to attend one meeting, but rather because of his refusal to transfer four months earlier, this still does not establish disparate treatment. The plaintiff failed to meet his burden of proof that he was treated less favorably than similarly situated employees and that the defendant's intent was discriminatory. *See Morgan v. Harris Trust & Sav. Bank of Chicago*, 867 F.2d 1023, 1026 (7th Cir.1989). He did not produce sufficient evidence for this court to infer that there was a causal link between the plaintiff's race and the plaintiff's forced resignation. *Id.; McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824. While the defendant's asserted reason for forcing the plaintiff to resign may be a fabricated explanation, this still does not establish that such a pretext was a pretext for discrimination. *See Pollard v. Rea Magnet Wire Co.*, 824 F.2d 557 (7th Cir.1987). This court does not find any evidence that any white employee was treated better than the plaintiff under the defendant's policies and that race was the determinative factor in the plaintiff's forced resignation. "A district judge does not sit in a court of industrial relations. No matter how medieval a firm's practices, no matter how high-handed its decisional process, no matter how mistaken the firm's managers, Title VII ... [does] not interfere." *Id.* at 560.

### Conclusion

Based upon the above-stated findings of fact and conclusions of law, this court GRANTS the defendant's motion for involuntary dismissal pursuant to Fed.R.Civ.P. 41(b) because of the plaintiff's failure to show disparate treatment in this Title VII cause of action. This dismissal operates as a final adjudication upon the merits, and judgment is entered for the defendants in an accompanying order.

### JUDGMENT

The court having this day filed its entry on the defendant's motion for involuntary dismissal pursuant to Fed.R.Civ.P. 41(b) in the above-captioned matter, now therefore, in accordance therewith,

IT IS ORDERED AND ADJUDGED that the plaintiff, Fred C. Henderson, takes

nothing by way of his complaint, and the cause of action is hereby dismissed.